------------------------------x
                            :
SHIRLEY R. GOFF and      :   Civ. No. 3:15CV00722(SALM)
GREGORY S. GIBSON        :
                            :
v.                       :
                            :
JOSHUA CHIVERS, et al.  :   May 17, 2017
                            :
------------------------------x

## MEMORANDUM OF DECISION

This is an action brought by plaintiffs Shirley E. Goff and Gregory S. Gibson against defendants, Connecticut State Trooper Joshua Chivers, Sergeant Ceruti, Sergeant Garcia, and Sergeant Butters, pursuant to section 1983 of Title 42 of the United States Code. [Doc. #1]. Plaintiff Goff ("Goff") alleges that defendants subjected her to excessive force during the course of her arrest, in violation of her Fourth Amendment rights. See id. Plaintiff Gibson ("Gibson") alleges that defendants violated his Fourth Amendment rights to be free from false arrest and malicious prosecution. See id. Plaintiffs seek monetary damages. A bench trial was held on December 12, 2016. [Doc. #60].[1]

_____

[1] At the close of plaintiff's evidence, the Court granted defendants Garcia, Ceruti and Butters' motion to be dismissed from the action. See Doc. #60; see also Transcript of the December 12, 2016, Bench Trial (hereinafter "Tr.") 95-6. From this point forward, "defendant" will refer solely to Chivers. The Court also reserved ruling on defendant's oral motion pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The Court construes defendant's motion as a motion for judgment

All parties presented testimony and evidence at trial. Four witnesses testified: plaintiff Shirley Goff; plaintiff Gregory Gibson; defendant State Trooper Joshua Chivers; and Sergeant Mark Devine. <u>See</u> Doc. #61. All of plaintiffs' and defendants' exhibits were entered into evidence by agreement of the parties. <u>See</u> Doc. #60; <u>see also</u> Tr. 5, lines 11-12.

Having considered the testimony of the witnesses and all of the documentary evidence presented, the Court finds that plaintiff Goff has failed to prove that she was subjected to excessive force in violation of her Fourth Amendment rights. The Court further finds that plaintiff Gibson has failed to prove that he was maliciously prosecuted in violation of his Fourth Amendment rights. The Court further finds that plaintiff Gibson has proven by the preponderance of the evidence that he was falsely arrested, in violation of his Fourth Amendment rights. In support of these determinations, the following constitutes the Court's findings of fact and conclusions of law pursuant to Rules 52(a) of the Federal Rules of Civil Procedure.

---

on partial findings under Rule 52(c), as this trial was before the Court, not a jury. Defendant's motion [Doc. # 59] is hereby **DENIED AS MOOT,** in light of the Court's ruling set forth below. <u>See</u> <u>Culhane v. Culhane</u>, 969 F. Supp. 2d 210, 214 n.1 (D. Conn. 2013) (quotation marks and citations omitted).

## FINDINGS OF FACT

Based on the entire record developed during trial, comprised of the credible testimony and the admitted exhibits, including the video recording of the incident, and the post-trial submissions, the Court finds the following facts to have been established.

At approximately 10:35 p.m. on May 20, 2012, plaintiff Goff was driving her vehicle in the southbound lane of Route 395 in Waterford, Connecticut. Gibson was a passenger in the vehicle. Gibson and Goff had spent several hours together at a casino and were heading back home. Defendant Connecticut State Police Trooper Joshua Chivers ("Chivers") was traveling in his State Police cruiser when he observed Goff's vehicle driving erratically. Chivers activated the lights on his cruiser. Upon seeing the flashing lights, Goff pulled her vehicle over into the breakdown lane and stopped.

Chivers, who was alone on patrol, exited the cruiser and approached the driver's side window of Goff's vehicle. After posing several questions to Goff through her open window, Chivers asked Goff to exit the vehicle, and she complied. Goff consented to attempting several sobriety tests. After several unsuccessful attempts, Goff was unable complete the tests posed, and became increasingly belligerent. Chivers made the decision to place Goff under arrest for operating under the influence.

At this point, Chivers, who was standing on the shoulder of the road facing Goff, asked Goff turn around. She complied. He reached for her arms and placed them behind her. Goff immediately started to struggle, attempting to free herself from Chivers' grasp. She started to step away from him and turned her body, causing Chivers to lose his grip on her right arm. Chivers then pushed Goff against the hood of the police cruiser, attempting to regain control of her arms and to limit her movement. Goff pushed herself up off the hood of the car and twisted her right arm and body away from Chivers. Keeping one hand on Goff's left arm, and one hand on her back, Chivers again pushed Goff against the hood of the police cruiser. Goff used her right arm, which was still free, to brace herself against the car, and then twisted her body and pulled her left arm away from Chivers. Chivers pushed his right hand onto her back and reached back for her left arm; Goff's head and upper body then came into contact with the hood of the car.[2]

Once Chivers regained control of Goff's left arm, he radioed for backup. Goff continued to resist, and did not comply with Chivers' five subsequent orders to put her right hand behind her back, continuing to hold on to the front of the car with her right hand. Chivers then successfully pried Goff's

---

[2] The video of the incident, admitted into evidence by stipulation, captures this entire scene. [Exhibit 502].

right hand off the car and placed it behind her back, and held Goff against the hood of the car. When she then complained that the hood was hot against her face, Chivers immediately moved Goff to the side of the cruiser. Chivers ordered Goff to stop moving <u>twenty-three</u> times over the course of the next four minutes; to stop resisting once; and to keep her hands still twice; before back-up arrived and Goff was placed in handcuffs.

As Chivers was administering the sobriety tests to Goff, Gibson remained seated in the passenger seat of Goff's vehicle, watching the events transpire through the vehicle's side view and rearview mirrors. As Chivers first attempted to place Goff under arrest, Gibson stood up and stepped out of the car, remaining next to the passenger's side front door. Upon seeing Chivers and Goff begin to struggle, Gibson yelled loudly at Chivers, expressing his displeasure.[3] Chivers directed him to get

---

[3] There is conflicting evidence as to what, exactly, Gibson yelled. The police Investigation Report, written by Chivers, indicates that Gibson called Chivers a "State Pig" and that Chivers "was beating up his girlfriend." Exhibit 501. At trial, Chivers testified that Gibson was yelling back and forth with Goff, but did not testify as to any specific statement that Gibson made that was directed towards Chivers. <u>See</u> Tr. 106, lines 17-23; 133-34, lines 23-1. Chivers did testify that Gibson did not use any fighting words, and that nothing he said was threatening. <u>See</u> <u>id.</u> at 124-25, lines 22-7; 126, lines 15-18. Gibson testified that he said: "What's wrong with you? You don't treat a girl like that." <u>Id.</u> at 55, lines 22-24; 69, lines 6-8; 82, lines 17-18. To the extent that Gibson made any statements directed at Chivers, they are unintelligible in the video of the incident.

back into the car, and continued to struggle with Goff. Gibson complied with this order. He sat back down in the vehicle, with the passenger side door open, his body facing outwards with his feet outside the vehicle on the ground. Chivers, who was still attempting to control Goff, yelled at Gibson to sit in the car and to shut his mouth; Gibson then turned his body to face forward so that his feet were no longer outside the vehicle, and closed the car door. He continued to watch and listen to Chivers' interaction with Goff through his open window, and he also lowered the convertible roof of Goff's car so that he could have a better view.

After Chivers had Goff under control, but not handcuffed, Gibson and Goff communicated, with Goff yelling to Gibson from where she stood with Chivers by the police cruiser, and Gibson yelling back to Goff from his position in the passenger seat of Goff's car. Goff asked Gibson to contact various people by phone and to call the media. Gibson used his cellphone to call a friend. He did not get out of the vehicle again until the officers placed him under arrest.

A sergeant arrived at the scene and assisted Chivers in handcuffing Goff, who was then placed in the police cruiser.[4]

_____

[4] At trial, Chivers testified that Sergeant Devine was the individual who arrived at the scene and assisted Chivers in handcuffing Goff, and with whom he discussed Mr. Gibson's conduct. See Tr. 110, lines 2-5; 111, lines 9-13; 120-21, lines

Chivers then relayed to the sergeant that Gibson had been "out of control." Exhibit 502 at 19:55. He told the sergeant that Gibson had "stepped out of the car once, and he spent the whole time looking out and screaming at me." Id. at 21:33. The sergeant asked: "Do you want to grab him for interference?" Id. at 21:36. Chivers replied: "Yeah, that works." Id. at 21:40. Gibson was then arrested.

Both plaintiffs were transported to the State Police barracks. Goff was charged with Operating Under the Influence, in violation of section 14-227a of the Connecticut General Statutes; Failure to Drive in Proper Lane, in violation of section 14-236; and Interfering with an Officer, in violation of section 53a-167a. Photographs were taken of Goff's thumb, which was bleeding, and she received medical attention before being released on a non-surety bond. Goff was then transported by ambulance from the barracks to the hospital, where a CAT scan was performed, and a bandage was placed on her thumb. She received no further treatment for any injuries she sustained in connection with her arrest.

Gibson was also released on a non-surety bond, and was given an appearance date to appear in court in connection with

_____

25-21. Sergeant Devine, however, testified that Sergeant Garcia discussed Mr. Gibson's conduct with Chivers, and suggested a charge of Interference. See id. at 166-67, lines 24-10. The Court finds that this discrepancy is of no consequence.

the charge of Interfering with an Officer, in violation of
section 53a-167 of the Connecticut General Statutes. Gibson
hired an attorney to represent him in the criminal matter, and
appeared one time in court before the charge against him was
nolled.

### CONCLUSIONS OF LAW

## I.   Section 1983

Plaintiffs' claims are brought pursuant to section 1983 of
Title 42 of the United States Code. "A §1983 claim has two
essential elements: (1) the defendant acted under color of state
law; and (2) as a result of the defendant's actions, the
plaintiff suffered a denial of her federal statutory rights, or
her constitutional rights or privileges." Annis v. Cty. of
Westchester, 136 F.3d 239, 245 (2d Cir. 1998). To prevail on a
section 1983 claim, plaintiffs must allege the personal
involvement of the individual defendant. See Costello v. City of
Burlington, 632 F.3d 41, 48–49 (2d Cir. 2011) (citing Wright v.
Smith, 21 F.3d 496, 501 (2d Cir. 1994)). Here, each plaintiff
alleges a Fourth Amendment deprivation. The Court will address
each claim in turn.

## II.  Due Process Claim

As an initial matter, plaintiffs' Complaint contains an
allegation that plaintiffs were deprived of their property
without due process of law. See Doc. #1 at 4. This claim was

subject to a ruling on defendants' motion in limine and was excluded from trial, absent objection from plaintiffs. See Doc. #42. At that time, the Court explicitly stated: "The Court also notes that plaintiffs did not request any substantive jury instructions related to the Due Process claim, see Doc. #30-3, leading the Court to question whether this claim has been abandoned." Doc. #42.

Indeed, plaintiffs did not include any discussion of this claim in their proposed Findings of Fact and Conclusions of Law. See Doc. #48. During the December 5, 2016, Pretrial Conference in this matter, counsel for plaintiffs confirmed that plaintiffs were pursuing an excessive force claim as to plaintiff Goff, and false arrest and malicious prosecution claims as to plaintiff Gibson. See Transcript of the December 5, 2016, Pre-Trial Conference at 8, lines 5-16 ("THE COURT: [W]e reviewed your proposed findings of fact and conclusions of law, and I want to make sure we are all on the same page about what the current claims are by each plaintiff in this case. So my read, Mr. Merly, was that Ms. Goff has only an excessive force case at this point, and Mr. Gibson has a false arrest and [a] malicious prosecution claim; is that right? MR. MERLY: That's correct, your Honor.").

The Court views this statement as an explicit abandonment of the Due Process claim. However, even "[w]here abandonment [of

a claim] ... is not explicit but such an inference may be fairly
drawn from the papers and circumstances viewed as a whole,
district courts may conclude that abandonment was intended."
Jackson v. Fed. Exp., 766 F.3d 189, 196 (2d Cir. 2014).
Accordingly, based on the above, the Court deems plaintiffs' due
process claim abandoned. See Bahrami v. Ketabchi, No.
05CV3829(RMB), 2009 WL 513790, at *10 (S.D.N.Y. Feb. 27, 2009)
(deeming defendant's counterclaims abandoned because "because he
failed to provide testimony or propose findings of fact or
conclusions of law in support of his counterclaims"), aff'd, 365
F. App'x 266 (2d Cir. 2010); Abeles, Inc. v. Creekstone Farms
Premium Beef, LLC, No. 06CV3893(JFB)(AKT), 2010 WL 446042, at *1
n.5 (E.D.N.Y. Feb. 1, 2010) (same); Jett v. Ficara, No.
04CV9466(RMB) 2007 WL 2197834, at *2 n.1 (S.D.N.Y. July 31,
2007) (deeming plaintiffs' claims for unfair competition
abandoned "since plaintiffs' proposed findings of fact and
conclusions of law do not address these ... two claims in any
respect").

## III. **Excessive Force, as to Plaintiff Goff**

"The Fourth Amendment prohibits the use of unreasonable and
therefore excessive force by a police officer in the course of
effecting an arrest." Tracy v. Freshwater, 623 F.3d 90, 96 (2d
Cir. 2010) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)).
"It is well established that use of force is contrary to the

Fourth Amendment if it is excessive under objective standards of reasonableness." Stephenson v. Doe, 332 F.3d 68, 77 (2d Cir. 2003) (quotation marks and citation omitted).

> This objective standard allows for split-second judgments -- circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a given situation. It allows even for a certain degree of mistake. If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.

Santana v. City of Hartford, 283 F. Supp. 2d 720, 727 (D. Conn. 2003) (quotation marks and citations omitted).

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (quotation marks and citation omitted). "In conducting that balancing, [the Court is] guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Tracy, 623 F.3d at 96 (citing Graham, 490 U.S. at 396). "If the force used was unreasonable and excessive, the plaintiff may recover even if

the injuries inflicted were not permanent or severe." <u>Robison v.</u>
<u>Via</u>, 821 F.2d 913, 924 (2d Cir. 1987).

Plaintiff Goff claims that she was subjected to excessive
force during the course of her arrest. In determining whether
Chivers' use of force was objectively reasonable, the Court
considers the factors set forth in <u>Graham</u>, 490 U.S. at 396.
<u>First</u>, the crime leading to Goff's arrest was relatively
serious. Chivers reasonably believed that Goff was operating a
vehicle while under the influence of drugs or alcohol. This is
considered a "serious crime." <u>Harwe v. Floyd</u>, No.
3:09CV1027(MRK), 2011 WL 674024, at *16 (D. Conn. Feb. 17, 2011)
(citing <u>South Dakota v. Neville</u>, 459 U.S. 553, 559 (1983)),
<u>aff'd</u>, 545 F. App'x 20 (2d Cir. 2013). The Court also notes that
<u>no</u> amount of force was employed by Chivers until <u>after</u> Goff
actively resisted arrest. <u>See</u> <u>Tracy</u>, 623 F.3d at 98 (in
analyzing whether use of force was reasonable under <u>Graham</u>,
finding that the crime in question became "arguably more
serious" when plaintiff resisted arrest).

<u>Second</u>, the threat posed to the safety of Chivers, and to
others, appeared immediate. <u>See</u> <u>id.</u> Chivers was alone, at night,
on the side of a busy highway, and Goff was fighting Chivers'
attempts to place her under arrest. <u>See</u> <u>Tracy</u>, 623 F.3d at 97
("[T]he risk posed to officer safety appeared to be both real
and imminent. It is uncontested that [the officer] was operating

without back up on the side of a road at night and in bad weather. Accordingly, what appeared to be [plaintiff's] attempt to flee or fight back posed a potentially serious and imminent risk to [the officer's] safety.").

_Third_, Goff was "actively resisting arrest or attempting to evade arrest by flight." _Graham_, 490 U.S. at 396. Goff consistently failed to comply with Chivers' multiple orders. She physically resisted arrest, wrenching her arms away from Chivers' grasp several times. At trial, Goff admitted that -- despite Chivers' orders -- she continued to move and did not stop until she was handcuffed, and that she did not cooperate with Chivers' efforts to arrest her. _See_ Tr. 39, lines 18-23; 40, lines 4-7; 46, lines 2-4; 47, lines 11-14.

On the night in question, Chivers found himself on the side of a busy highway, at night, without backup, with an individual whom he reasonably believed had committed a serious crime. That individual did not comply with his orders, and physically resisted his attempts to place her under arrest. It was objectively reasonable for Chivers to feel threatened in that situation, and to use force to gain control of Goff.

The Court is mindful that

> [t]he fact that a person whom a police officer attempts
> to arrest resists, threatens, or assaults the officer no
> doubt justifies the officer's use of some degree of
> force, but it does not give the officer license to use
> force without limit. The force used by the officer must

be reasonably related to the nature of the resistance
and the force used, threatened, or reasonably perceived
to be threatened, against the officer.

Sullivan v. Gagnier, 225 F.3d 161, 165–66 (2d Cir. 2000). Here,

after Goff's several attempts to evade Chivers' grasp, it was

reasonable for Chivers to push Goff against his vehicle to limit

her movement and to gain control of the situation. In making

this determination, the Court also considers what Chivers did

not do to Goff: he did not make use of pepper spray or any other

device to incapacitate her; he did not strike her or kick her;

and he chose not bring her to the ground, because he did not

want to put his weight on her and injure her. See Tr. 105, lines

1–6. Cf. Brown v. City of New York, 798 F.3d 94, 102–03 (2d Cir.

2015) (finding a question of fact as to whether force was

excessive where two police officers brought plaintiff, a 120-

pound woman, to the ground and twice sprayed her directly in the

face with pepper spray for refusing to "submit to the easy

application of handcuffs").

Finally, while Goff apparently suffered injuries during the

course of her arrest, the Court finds that said injuries are

attributable to Goff's resistance, rather than Chivers' use of

force.[5] Goff testified that her thumb was cut by Chivers'

---

[5] The Court also recognizes that in determining a claim of
excessive force, "[t]he 'core judicial inquiry' is 'not whether
a certain quantum of injury was sustained,' but rather whether
unreasonable force was applied given the circumstances." Barcomb

handcuffs; however, the Court credits the testimony of Chivers, who indicated that Goff cut her thumb on the front "push bumper" of the police cruiser in her attempt to evade Chivers. Goff also testified that Chivers pushed her head against the hood of the car, causing her to suffer a concussion, but the Court is persuaded both by Chivers' testimony and the video of the incident that reveals that Goff's head came into contact with the car hood while she was attempting to break free from Chivers' hold.

Based on the foregoing, the Court concludes that plaintiff Goff has not proven by a preponderance of the evidence that the force used by defendant Chivers in effectuating her arrest was excessive. Accordingly, the Clerk is directed to enter judgment in favor of defendant Chivers with respect to plaintiff Goff's claim for the use of excessive force, in violation of 42 U.S.C. §1983.

## IV.  **False Arrest, as to Plaintiff Gibson**

### A.  **Elements, Generally**

The elements of a claim for false arrest pursuant to section 1983 are dictated by state law. See Jocks v. Tavernier,

---

v. Kraeger, No. 3:14CV1159(JBA), 2016 WL 2644885, at *4 (D. Conn. May 5, 2016) (quoting Wilkins v. Gaddy, 559 U.S. 34, 37 (2010)). Indeed, "injury and force are only imperfectly correlated, and it is the latter that ultimately counts." Id. at *5 (quotation marks and citation omitted).

316 F.3d 128, 134 (2d Cir. 2003); see also Davis v. Rodriguez,
364 F.3d 424, 433 (2d Cir. 2004) ("In analyzing §1983 claims for
unconstitutional false arrest, [the court] generally look[s] to
the law of the state in which the arrest occurred."). "Under
Connecticut law, false imprisonment, or false arrest, is the
unlawful restraint by one person of the physical liberty of
another." Russo v. City of Bridgeport, 479 F.3d 196, 204 (2d
Cir. 2007) (quotation marks and citation omitted).

"In a false arrest action, Connecticut law places the
burden of proving an unlawful arrest on the plaintiff." Russo,
479 F.3d at 203 (internal citations omitted); see also Davis,
364 F.3d at 433. "In order to establish a §1983 false arrest
claim based on the Fourth Amendment right to be free from
unreasonable seizures, a plaintiff must show: (1) the defendant
intentionally arrested him or had him arrested; (2) the
plaintiff was aware of the arrest; (3) there was no consent for
the arrest; and (4) the arrest was not supported by probable
cause." Marchand v. Simonson, 16 F. Supp. 3d 97, 109 (D. Conn.
2014) (quotation marks and citation omitted). Further, in
Connecticut, "favorable termination is an element of a section
1983 claim sounding in false imprisonment or false arrest."
Miles v. City of Hartford, 445 F. App'x 379, 383 (2d Cir. 2011);

see also <u>Frey v. Maloney</u>, 476 F. Supp. 2d 141, 147-48 (D. Conn. 2007).[6]

The first three elements of false arrest, above, are not disputed. Plaintiff Gibson has established that defendant Chivers intentionally arrested him; Gibson was aware of his arrest; and Gibson did not consent to be arrested. Plaintiff has also established that the charges against him terminated favorably. Thus, the Court need only determine whether defendant Chivers had probable cause to arrest plaintiff Gibson.

**B.    Probable Cause**

"In assessing whether an officer had probable cause for an arrest, a court must look at the totality of the circumstances." <u>Marchand</u>, 16 F. Supp. 3d at 110 (quotation marks and citation

---

[6] Plaintiff "may satisfy the favorable termination element by showing that the charges against [him] were discharged without a trial under circumstances amounting to the abandonment of the prosecution without request by him or arrangement with him." <u>Frey</u>, 476 F. Supp. 2d at 148 (emphasis omitted) (quotation marks and citation omitted). "A <u>nolle prosequi</u> ... can constitute a favorable termination, so long as the plaintiff demonstrates that it was entered under circumstances indicating that the State has abandoned the prosecution without request by the plaintiff or arrangement with him." <u>Id.</u> at 148; <u>see also</u> <u>Roberts v. Babkiewicz</u>, 582 F.3d 418, 421 (2d Cir. 2009) ("The majority of cases from Connecticut courts interpret Connecticut law so that a nolle prosequi satisfies the 'favorable termination' element as long as the abandonment of the prosecution was not based on an arrangement with the defendant."). Here, the uncontested testimony establishes that the charges against Gibson were nolled without an arrangement with the defendant. <u>See</u> Tr. 59-60, lines 13-1.

omitted). Under federal law, "[p]robable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991); see also Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) ("An officer has probable cause to arrest when in possession of facts sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense."). "Likewise, under Connecticut law, probable cause comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." Weinstock v. Wilk, 296 F. Supp. 2d 241, 246 (D. Conn. 2003), adhered to on reconsideration, No. 3:02CV1326(PCD), 2004 WL 367618 (D. Conn. Feb. 25, 2004). "In determining whether the necessary quantum of evidence existed to support a finding of probable cause, the Court is required to evaluate the totality of the circumstances. In making this determination, the Court must consider those facts available to the officer at the time of the arrest." Reese v. Garcia, 115 F. Supp. 2d 284, 290 (D. Conn. 2000).

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false

arrest, whether that action is brought under state law or under §1983." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (quotation marks and citations omitted). Thus, "in Connecticut, a false arrest claim cannot lie when the challenged arrest was supported by probable cause." Russo, 479 F.3d at 203.

In the instant matter, plaintiff Gibson has proven that defendant Chivers lacked probable cause to arrest plaintiff for the charge of Interfering with an Officer pursuant to section 53a-167a of the Connecticut General Statutes. That section provides, in relevant part:

> A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer ... in the performance of such peace officer's ... duties.

Conn. Gen. Stat. §53a-167a.

"A violation of Section 53a-167a requires specific intent to interfere with an officer." Jackson v. Town of Bloomfield, No. 3:12CV00924(MPS), 2015 WL 1245850, at *10 (D. Conn. Mar. 18, 2015) (quotation marks and citation omitted); see also State v. Williams, 534 A.2d 230, 239 (Conn. 1987) ("[Section 53a-167a] encompasses only interference that is intentional.").

In interpreting the scope of section 53-167a, the Connecticut Supreme Court, "[t]o avoid the risk of constitutional infirmity," has construed the statute "to proscribe only physical conduct and fighting words that by their

very utterance inflict injury or tend to incite an immediate breach of the peace." Williams, 534 A.2d at 239 (quotation marks and citation omitted). As the Connecticut Court noted in reading the statute in this narrow manner, the United States Supreme Court had previously struck down, as overbroad, an ordinance making it "unlawful for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty[.]" City of Houston, Tex. v. Hill, 482 U.S. 451, 455 (1987). The Hill Court noted that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." Id. at 461. Citing its own earlier decision in Lewis v. City of New Orleans, 415 U.S. 130 (1974), the Court reaffirmed that a statute that punishes "only spoken words" and is "not limited in scope to fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace[]" cannot survive constitutional scrutiny. Id. at 461-62. The ordinance at issue in Hill was even "more sweeping" than the law challenged in Lewis, the Court held, because it "prohibits speech that 'in any manner ... interrupt[s]' an officer." Id. at 462 (internal citation omitted). In conclusion, the Court stated:

> Today's decision reflects the constitutional requirement
> that, in the face of verbal challenges to police action,
> officers and municipalities must respond with restraint.
> We are mindful that the preservation of liberty depends
> in part upon the maintenance of social order. But the

First Amendment recognizes, wisely we think, that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive.

Hill, 482 U.S. at 471–72 (internal citation omitted).

Thus, the Connecticut Supreme Court's holding in Williams was dictated by an established line of United States Supreme Court precedent. Courts construing the Connecticut statute since Williams have acknowledged the necessarily narrow reading. "This unequivocal statement concerning the scope of the statute leaves no room for an interpretation that would permit an arrest for verbal interference involving something other than fighting words." Darbisi v. Town of Monroe, No. 3:00CV01446(RNC), 2002 WL 32348250, at *2 (D. Conn. Jan. 11, 2002), aff'd, 53 F. App'x 159 (2d Cir. 2002); see also Torlai v. LaChance, No. 3:14CV00185(JCH), 2015 WL 9047785, at *7 (D. Conn. Dec. 15, 2015) ("[V]arious Connecticut courts have explored the exact contours of what constitutes physical conduct and fighting words, but the basic proposition that only physical conduct and fighting words give rise to a viable charge of interfering with an officer has remained well-settled." (quotation marks and citation omitted)).

A third manner of violation of the statute has emerged in the case law since Williams was decided; that is, failure to comply with a direct order of a police officer under certain

circumstances. Cf. Acevedo v. Sklarz, 553 F. Supp. 2d 164, 168 (D. Conn. 2008) ("Connecticut courts most frequently find illegal interference with a police officer where the officer makes a direct request, which the defendant refuses to comply with, and it is that refusal that hinders or impedes the course of the investigation of the defendant or the performance of the officer's duties." (citation omitted)). Thus, the Court will consider whether the evidence adduced at trial establishes that Chivers had probable cause to charge Gibson with Interfering on any of the three possible theories: fighting words; physical conduct; or refusal to obey a direct order.

Gibson testified that while Chivers was administering the sobriety tests to Goff, he remained in the vehicle, watching Chivers and Goff through the rearview and side view mirrors. See Tr. 63, lines 19-23. When he heard Goff call out, he stood up and stepped out of the vehicle, and shouted at Chivers. See id. at 69, lines 2-8. He then immediately sat back down when Chivers ordered him to get back in the vehicle. See id. at 56, lines 4-9. He did not exit the vehicle again; he never approached Chivers; and he did not threaten Chivers in any manner. See id. at 57, lines 4-13. He did not refuse any orders that Chivers directed to him, nor did he attempt to prevent Chivers from placing Goff under arrest. See id. at 57-8, lines 21-1. The

Court credits Gibson's testimony, which is supported by the video of the events.

At trial, Chivers testified that he felt that Gibson posed a threat to him by his very presence, and that Gibson's actions and words caused a distraction, thereby delaying Chivers from securing Goff's arrest. See Tr. 114-15, lines 24-3; 118, lines 22-25; 125, lines 10-16; 126, lines 10-14. Chivers testified that while he was occupied with Goff, Gibson shouted that Chivers was beating up Goff; he slapped the side of the car once or twice; he was on his cellphone; he communicated back and forth with Goff; and he was sitting in the vehicle in such a way that he could jump out, if he wanted to. See id. at 106-07, lines 19-1. However, Chivers conceded that he had never ordered Gibson to put his feet in the car, to stop looking backwards, or to close the car door. See id. at 124, lines 2-17. Chivers also testified that the words that Gibson used were not threatening; that Gibson complied with his orders; and that at no time did Gibson attempt to approach Chivers or prevent the arrest of Goff. See id. at 122, lines 16-17, 22-24; 123-24, lines 24-1; 124-25, lines 22-7. Chivers asserted that the conduct supporting the arrest of Gibson was that Gibson was attempting to distract him.[7] See id. at 123, lines 8-23; 126, lines 10-14.

---

[7] On cross-examination, Chivers testified that he had probable cause to charge Gibson with Interference because the statute

Under these circumstances, there was not probable cause to arrest Gibson for a violation of section 53a-167a under any of the three acknowledged theories of liability. <u>First</u>, plaintiff Gibson's limited verbal utterances were not fighting words. "Fighting words portend imminent physical violence or are likely to prompt imminent physical retaliation." <u>Ruttkamp v. De Los Reyes</u>, No. 3:10CV392(SRU), 2012 WL 3596064, at *6 (D. Conn. Aug. 20, 2012) (quotation marks and citation omitted). At no time did Gibson's words rise to this level. The utterances directed towards Goff and Chivers were not likely to prompt <u>any</u> physical

---

"says to hinder, which means to delay. If I'm distracted by what he's doing, [he's] delaying my ability to place her into handcuffs." Tr. 125, lines 13-16. The following exchange then occurred with plaintiff's counsel:

> Q: So, by that logic, by that reason, if Mr. Gibson had suddenly gotten out of the car and started singing, let's say, sounds bizarre, at the top of his lungs, and you stopped what you were doing because you were distracted, could you theoretically charge him there with interfering?
> A: Yes.
> Q: If he started singing?
> A: Yes, sir.
> ...
> Q: [B]y your reasoning, anything Mr. Gibson does that ends up distracting you is probable cause for interfering, correct?
> A: If you can articulate how he distracted you and caused you not to be able to do your duty, yes.

<u>Id.</u> at 125-26, lines 17-14.

retaliation and certainly did not portend imminent physical violence.[8]

Indeed, at most, Gibson's statements were intended to protest the actions of Chivers. This is insufficient to invoke the application of section 53a-167a. See Williams, 534 A.3d at 238 ("The statute's requirement of intent limits its application to verbal conduct intended to interfere with a police officer and excludes situations in which a defendant merely questions a police officer's authority or protests his or her action.").

Second, Gibson did not interfere with an officer by his physical conduct. The evidence reveals that Gibson never stepped towards Chivers and Goff, and never attempted to physically intervene in Goff's arrest. After he initially stood up from his seated position in the car, Gibson promptly complied with Officer Chivers' directive to get back into the car and sit down. The video of the incident shows that once ordered to sit, Gibson sank down from his standing position directly into the seat. See Exhibit 502 at 13:01-13:06. He took no steps backwards

---

[8] The Court notes that "the fighting words exception may require a narrower application in cases involving words addressed to a police officer, because a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." Williams, 534 A.2d at 239 (quotation marks omitted) (emphasis added) (citing Houston v. Hill, 482 U.S. 451 (1987)); see also Ruttkamp, 2012 WL 3596064, at *6.

before sitting, evidencing that he had taken no steps in Chivers' direction while standing. See id. He then complied with the second order of Chivers to stay in the car. Thus, plaintiff never physically interfered with Chivers.

Chivers, a trained State Trooper, stopped a vehicle and administered sobriety tests to a suspected drunk driver, Goff, on the side of a busy highway. When Goff failed the sobriety tests and became belligerent and combative, he attempted to place her under arrest. She resisted. Chivers was aware that there was a passenger in the vehicle; presumably, car stops often involve the presence of passengers, and this was not Chivers' first car stop.[9] When the passenger, Gibson, stepped out of the vehicle, Chivers immediately shouted, loudly, at him to sit down, which Gibson did. No other vehicles stopped; no crowds gathered. The one verbal protestation directed at Chivers, and the communications with Goff, made from a distance, were not in any way violent or incitant, and were not intended to prevent the arrest of Goff. Thus, there was no probable cause to arrest Gibson based on fighting words or physical conduct.

Third, there was no probable cause to arrest Gibson based on any refusal to comply with a direct order. Defendant, in his

---

[9] In fact, Chivers testified that this particular stop resulted in his 186th arrest of an individual for driving under the influence.

post-trial brief, cites to several cases finding probable cause under this theory.[10] The cited cases, however, are inapposite.

In Coffey v. Callaway, 86 F. Supp. 3d 111 (D. Conn. 2015), the defendant police officer responded to a complaint about a rowdy party. Upon his arrival, the officer directed those present to disperse, and, specifically, directed plaintiff Coffey to go into his home. See id. at 114-15. Plaintiff refused. See id. The defendant argued that plaintiff's direct refusal to comply with the officer's order constituted "passive resistance" that was actionable under the Interfering statute. Id. at 117-18. The Court considered plaintiff's actions "confrontational conduct" and found probable cause for the arrest. Id. at 121.

Coffey relies heavily on an earlier case, also cited by defendant here, Herpel v. Joyce, No. 89CV669(JAC), 1992 WL 336765 (D. Conn. Sept. 30, 1992). There, the undisputed facts established that "plaintiff was asked three times to leave the crosswalk, and each time he declined to do so -- insisting, instead, on engaging the officers in a discussion about his

---

[10] In addition to the cases analyzed herein, the defendant also cites to State v. Aloi, 911 A.2d 1086, 1092 (Conn. 2007), and State v. Ragin, 942 A.2d 489, 493 (Conn. App. 2008). These cases are also inapposite. Aloi involves a refusal to provide identification to a police officer, which is not an issue here, and also constitutes a refusal to obey a direct order. Ragin involves a refusal to disperse in response to police directives. As noted, Gibson did not refuse any direct order given him.

reasons for remaining there." Id. at *5. Again, the Court found probable cause for an Interfering charge.

A third case cited by defendant is perhaps most illuminating here. In Huertas v. Ivanko, No. 3:11CV00528(VLB), 2013 WL 1193187, at *12 (D. Conn. Mar. 25, 2013), the Court found that when plaintiff had "attempted to intervene in [his friend's] arrest and refused to step back more than approximately two feet despite repeated warnings to do so," he had been "guilty of obstructing or hindering" the defendant officer in his duties.

In all three of these cases, the plaintiff intentionally refused to comply with a direct order given by the defendant officer, and that is the basis on which the Court found probable cause for an Interfering charge. The circumstances of Huertas are most comparable to the circumstances of this case; there, the person ultimately arrested for Interfering was specifically attempting to prevent the arrest of his friend.[11] But the plaintiff in Huertas was between "eight to ten inches" and "two to three feet" away from the officer attempting to arrest his

---

[11] Another case involving the alleged interference of one person in the arrest of another is Acevedo, 553 F. Supp. 2d at 164. There, the Court denied the defendant officer summary judgment on the grounds that there was a material dispute regarding whether the plaintiff's yelling was intended to incite the crowd present at the time. See id. at 168. This case, too, is inapposite, as here no crowd was present to incite.

friend at various points. Huertas, 2013 WL 1193187 at *4. The plaintiff acknowledged that he refused repeated, direct instructions to step away from the officer, and "didn't stop talking[]" to the officer, demanding to know why his friend was being arrested. Id. By contrast, in this case, it is undisputed that Gibson was at least "a car length and a half" away from Chivers while he was attempting to secure Goff. Tr. 132, line 4.

More importantly, though, in all three cited cases above, and indeed, in all cases cited to the Court by defendant, the person arrested for Interfering had refused to obey a direct order of the officer. Here, the evidence at trial established that Gibson obeyed all orders given by Chivers.

Accordingly, defendant Chivers lacked probable cause to charge plaintiff Gibson with Interfering with an officer, in violation of section 53-167a of the Connecticut General Statutes. As noted above, the other elements of a false arrest claim have been met: Chivers intentionally arrested Gibson; Gibson was aware of the arrest; and Gibson did not consent to the arrest. Accordingly, plaintiff Gibson has proven by a preponderance of the evidence that he was falsely arrested, in violation of his Fourth Amendment rights.

### C. Qualified Immunity

Having determined that Chivers did not have probable cause to arrest Gibson, the Court must determine whether defendant has

established an entitlement to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted).

> An officer is entitled to qualified immunity against a suit for false arrest if he can establish that he had arguable probable cause to arrest the plaintiff. Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.

Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (quotation marks and citations omitted). See also Ricciuti, 124 F.3d at 128.

> "Arguable" probable cause should not be misunderstood to mean "almost" probable cause. ... There should be no doubt that probable cause remains the relevant standard. If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer.

Jenkins v. City of N.Y., 478 F.3d 76, 87 (2d Cir. 2007) (citations omitted). Thus, "[a]lthough a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or

(b) was plainly incompetent." <u>Manganiello v. City of N.Y.</u>, 612 F.3d 149, 165 (2d Cir. 2010) (collecting cases).

It is well established that there is a clearly established right to be free from arrest in the absence of probable cause. <u>See</u> <u>Shattuck v. Town of Stratford</u>, 233 F. Supp. 2d 301, 308 (D. Conn. 2002) ("[T]here is no question that the plaintiff had a constitutional right to not be arrested without probable cause and that the relevant case law is well established on this point." (collecting cases)); <u>see also</u> <u>Cook v. Sheldon</u>, 41 F.3d 73, 78 (2d Cir. 1994) ("It is now far too late in our constitutional history to deny that a person has a clearly established right not to be arrested without probable cause."). The scope of the Interfering statute under Connecticut law is also clearly established, by the very cases cited in the parties' post-trial briefing. Thus, the inquiry for the Court is whether, based on the facts known to the defendant at the time of the arrest, reasonable officers could disagree as to whether there was probable cause to arrest plaintiff Gibson for Interfering with an Officer, in violation of section 53a-167a of the Connecticut General Statutes.

The Court concludes that it was objectively <u>unreasonable</u> for Chivers to construe Gibson's words and actions as violative of section 53a-167a. As discussed above, Gibson's words were not threatening, nor was his conduct disobedient. He did not refuse

to comply with Chivers' orders. He never physically approached Chivers or his cruiser. <u>See</u> Tr. 122-23, lines 25-2. He did not use fighting words. <u>See</u> Tr. 126, lines 15-18. As Chivers himself testified, it was not the content of Gibson's speech but rather the fact that he was speaking <u>at all</u> that Chivers felt gave him cause to charge Gibson under the statute. <u>See</u> Tr. 134, lines 13-19.

The scope Chivers attributes to the Interfering statute would place that statute squarely within the holdings of <u>Williams</u>, <u>Hill</u> and <u>Lewis</u>. Under Chivers' understanding of the law, mere speech, or, indeed, singing or laughing by a person present during the arrest of a third party -- or anything else that delays the arrest of the third party or "ends up distracting" the officer -- would give rise to probable cause for an Interfering charge. Tr. 125, line 11. This is a completely unreasonable reading of the statute, as it has been interpreted by many courts over many years.

The Court in <u>Ruttkamp</u> considered a similar argument by a defendant seeking qualified immunity on a claim of false arrest of plaintiff Shlomit under the Interfering statute:

> As noted above, the Connecticut Supreme Court specifically limited the scope of the interference statute as follows: "To avoid the risk of constitutional infirmity, we construe §53a-167a to proscribe only physical conduct and fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace." <u>Williams</u>, 205 Conn. at 473

(internal quotation marks omitted). This unequivocal
statement from the state's highest court "leaves no room
for an interpretation that would permit an arrest for
verbal interference involving something other than
fighting words." <u>Darbisi v. Town of Monroe</u>, 2002 WL
32348250, at *2 (D. Conn. Jan. 11, 2002).

Here, there is no dispute that Shlomit's verbal
interference never amounted to fighting words; nothing
she said tended "to incite an immediate breach of the
peace." <u>Williams</u>, 205 Conn. at 473. Shlomit neither
threatened her daughter nor urged any violent or
physical response to the officer's request. Thus, the
fact that Shlomit's verbal pleadings and protestations
were directed at her daughter, instead of an officer, is
immaterial. No matter who she was talking to, Shlomit's
speech, which "merely question[ed] a police officer's
authority or protest[ed] his or her action," was plainly
outside the reach of section 53a-167a as construed by
the Connecticut Supreme Court. <u>Id.</u> at 472.

<u>Ruttkamp</u>, 2012 WL 3596064, at *8 (footnote omitted). This

holding, not cited by defendant, is squarely on point.

The Court finds that reasonable officers could not disagree

that Gibson had not interfered with an officer, within the

meaning of the statute as interpreted by the courts.

Accordingly, Chivers is not entitled to qualified immunity for

plaintiff Gibson's false arrest. The Clerk is therefore directed

to enter judgment in favor of plaintiff Gibson with respect to

his claim for false arrest in violation of 42 U.S.C. §1983.

**V.    Malicious Prosecution, as to Plaintiff Gibson**

    **A.    Elements, Generally**

"To prevail on a Section 1983 claim of malicious

prosecution, the plaintiff must show a violation of his rights

under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." Turner v. Boyle, 116 F. Supp. 3d 58, 84 (D. Conn. 2015) (quotation marks and citation omitted); see also Rutigliano v. City of N.Y., 326 F. App'x 5, 8-9 (2d Cir. 2009) ("To sustain a §1983 malicious prosecution claim, the state law elements must be met, and there must also be a showing of a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights."); Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013) (stating that for a malicious prosecution claim "to be actionable under section 1983 there must be a post-arraignment seizure, the claim being grounded ultimately on the Fourth Amendment's prohibition of unreasonable seizures").

Under Connecticut law, to establish malicious prosecution, the plaintiff must prove that: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." Torlai, 2015 WL 9047785, at *5 (quoting Brooks v. Sweeney, 299 Conn. 196, 210-11 (2010)); see also Shattuck, 233 F. Supp. 2d at 306.

**B. Fourth Amendment Violation**

The Court finds that plaintiff Gibson suffered a Fourth Amendment deprivation of liberty. The Second Circuit has "consistently held that a post-arraignment defendant who is obligated to appear in court in connection with criminal charges whenever his attendance is required suffers a Fourth Amendment deprivation of liberty." Swartz, 704 F.3d 105 at 112 (quotation marks and citation omitted) (collecting cases).

Plaintiff Gibson was placed in police custody and was transported to the police barracks before being released on bond. He was required to appear in court once in connection with the charge against him before the charge was nolled. Thus, plaintiff Gibson has proven a Fourth Amendment deprivation of liberty.

**C. Connecticut Malicious Prosecution Elements**

The first two elements of malicious prosecution under Connecticut law, described above, are not in dispute. Plaintiff Gibson has established that criminal charges were initiated by defendant against him, and that they terminated in his favor.[12]

---

[12] Defendant Chivers, as the arresting officer, initiated the criminal charges against plaintiff Gibson. Furthermore, Chivers completed an Investigation Report that supplied information to the prosecutor regarding the incident in question. At trial, Chivers conceded that he did not include certain information regarding the incident in the police report. "Where a party is responsible for providing false information ... that influences a decision whether to prosecute, he may be held liable for

Thus, to determine whether Gibson has proven that he was maliciously prosecuted, the Court must determine whether there was probable cause to prosecute plaintiff, and whether defendant acted with malice in prosecuting plaintiff Gibson.

### 1. Probable Cause

In Connecticut, "probable cause in the context of a malicious prosecution claim is 'the knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds for prosecuting an action.'" Torlai, 2015 WL 9047785, at *6 (quoting Falls Church Group, Ltd. v. Tyler, Cooper and Alcorn, LLP, 912 A.2d 1019, 1027 (Conn. 2007)). "[I]t is error to conflate probable cause to arrest with probable cause to believe that [plaintiff] could be successfully prosecuted." D'Angelo v. Kirschner, 288 F. App'x 724, 726 (2d Cir. 2008) (quotation marks and citation omitted). Thus, "[i]n the context of a malicious prosecution claim, a plaintiff must show that the defendants lacked probable cause to prosecute, not just to arrest." Lombardi v. Myers, No. 3:14CV1687(VAB), 2016 WL 4445939, at *4 (D. Conn. Aug. 18, 2016) (citation omitted). "Probable cause to prosecute is distinct from probable cause to

---

malicious prosecution." Chimurenga v. City of N.Y., 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999). The Court need not determine whether the omissions from Chivers' report constitute "false information," because the Court finds that plaintiff's claim fails due to a lack of showing of malice.

arrest and is assessed in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of the arrest." Coll v. Boisvert, No. 3:12CV01202(JCH), 2014 WL 508694, at *8 (D. Conn. Feb. 5, 2014) (quotation marks and citation omitted).

Here, the Court has already determined that Chivers did not have probable cause to arrest plaintiff Gibson for Interfering with an Officer. No additional evidence has been submitted that would indicate that there was probable cause to prosecute plaintiff Gibson. Defendant does not assert that he learned of any new information between the time that Gibson was arrested and the time the prosecution was instituted that would provide probable cause for Gibson's prosecution. Accordingly, the Court concludes that there was no probable cause to prosecute plaintiff Gibson for the crime for which he was charged.

### 2. Malice

"A party may demonstrate malice by showing that a prosecution was undertaken 'from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff,' including initiating proceedings without probable cause." Turner, 116 F. Supp. 3d at 85 (quoting Pinksy v. Duncan, 79 F.3d 306, 313 (2d Cir. 1996)); see also Torlai, 2015 WL 9047785, at *9 ("The final element of a malicious prosecution claim in Connecticut is that 'the defendant acted with malice,' which

means 'primarily for a purpose other than that of bringing an offender to justice.'" (quoting Brooks, 9 A.3d at 357)). While "a lack of probable cause generally creates an inference of malice," Manganiello, 612 F.3d at 163 (quotation marks and citation omitted), a "lack of probable cause does not definitively establish that a defendant acted with malice." Torlai, 2015 WL 9047785, at *9 (emphasis added).

The Second Circuit has explained the limitations of the inference of malice in a malicious prosecution case applying Vermont law, which mirrors Connecticut law on this point:

> Though a jury in a malicious prosecution suit may be entitled to infer the existence of the requisite malice from the same evidence used to establish probable cause ... the possibility of making such an inference does not remove malice as an essential element of the claim. If the [plaintiffs'] allegation that the [suit was initiated without cause] were to be accepted as a sufficient allegation of malice to state a claim, the effect would be to eradicate this careful distinction between malice and probable cause, and make the two synonymous as a matter of law.

Brault v. Town of Milton, 527 F.2d 730, 740 (2d Cir. 1975).

Plaintiff argues that the evidence adduced at trial establishes that Chivers acted with malice because (1) he omitted information favorable to Gibson from the police report he prepared, (2) he made misrepresentations about Gibson's behavior to the sergeant on the scene and in his report, and (3) he was angry at Gibson. See Doc. #67 at 8-10. The Court disagrees.

As to the first two arguments, the Court does not view the omission of certain information from Chivers' police report as evidence of malice. Nor does the Court agree that Chivers' statements to the sergeant on the scene, which arguably overstate the nature of Gibson's conduct during the incident, were intentionally false or misleading. The Court also credits Chivers' testimony that he believed that because Gibson's conduct distracted him, delaying his ability to arrest Goff, he had probable cause to arrest and prosecute Gibson for Interfering -- whether or not Gibson disobeyed his orders to sit down and to be quiet. Because these factors were irrelevant in Chivers' mind, there is no reason to believe he would have intentionally altered his verbal report to the sergeant or the written incident report to add or omit them. In Chivers' erroneous view, Gibson's compliance with his orders was immaterial.

As to the plaintiff's third argument, the Court does not find that the evidence at trial established that Chivers was particularly angry at Gibson. Chivers did raise his voice at Gibson during the incident, but he does not appear to have developed a personal animus against Gibson that would lead him to arrest Gibson on trumped up charges.

In sum, the plaintiff has not met his burden of establishing that Chivers was motivated by malice.[13]

Thus, Gibson's claim under section 1983 for malicious prosecution fails. Accordingly, the Clerk is directed to enter judgment in favor of defendant Chivers with respect to plaintiff Gibson's claim for malicious prosecution, in violation of 42 U.S.C. §1983.

## VI.  **Damages**

### A.    **Compensatory Damages**

"The basic purpose of §1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 307 (1986) (quotation marks and citation omitted) (emphasis omitted). Thus, "[d]amages are properly awarded for civil rights violations when the plaintiff has suffered an actual loss as a result of a constitutional deprivation." Henry v. Gross, 803 F.2d 757, 768 (2d Cir. 1986). "To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and

---

[13] Indeed, while Chivers testified that he planned to arrest Gibson even before Sergeant Devine arrived, the video of the incident establishes that it was actually the sergeant at the scene who proposed the particular charge of Interfering. See Tr. 121, lines 12-21.

suffering." <u>Memphis Cmty. Sch. Dist</u>, 477 U.S. at 307. However, "[w]here no injury [is] present, no compensatory damages [can] be awarded." <u>Id.</u> at 308.

> Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: garden-variety, significant, and egregious. In garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration.

<u>Vera v. Alstom Power, Inc.</u>, 189 F. Supp. 3d 360, 376 (D. Conn. 2016), <u>appeal dismissed</u> (Aug. 16, 2016) (quotation marks and internal citations omitted).

"[C]onstitutional tort liability under §1983 is limited to the kind of injury that the constitutional right at issue was designed to prevent." <u>Townes v. City of N.Y.</u>, 176 F.3d 138, 148 (2d Cir. 1999) (quotation marks and citation omitted). "[T]he common law tort of false arrest (or false imprisonment) allows plaintiffs to seek damages from the time of detention up until issuance of process or arraignment, but not more[.]" <u>Id.</u> at 149 (quotation mark and citation omitted). "The damages recoverable for loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering; even absent such other injuries, an award of several

thousand dollars may be appropriate simply for several hours'
loss of liberty." <u>Kerman v. City of N.Y.</u>, 374 F.3d 93, 125-26
(2d Cir. 2004) (applying New York law) (collecting cases).

At trial, plaintiff Gibson testified that he posted a
$1,000 bond which was returned to him after appearing in court
in connection with the instant charge.[14] He was released upon
posting bond, having spent several hours in police custody.
Gibson testified that he appeared in court once, and was
represented by a private attorney whom he engaged for $13,500.

Gibson also testified at trial regarding the emotional
distress he suffered as a result of this incident:

> Geez, that was a real nightmare. You know? I was up for
> 36 hours. I couldn't think of nothing for at least three
> to four weeks. It was just like turmoil for a whole
> month. I couldn't think straight. It just kept going on
> and on and on. It made me very vicious, very mean. You
> know, I just -- I hated the State Police for what they
> had done, how they did it. They locked me up in a cell.
> It was over 100 degrees. I had trouble breathing.

Tr. 60, lines 5-13.

Gibson did not support his testimony with medical records
or evidence, and no evidence was presented that the distress he
suffered was permanent or had any physical manifestations.

The Court finds that plaintiff Gibson is entitled to
compensatory damages in the amount of $13,500 for the costs he

---

[14] Exhibit 108 reflects that the amount of the non-surety bond
that Gibson posted was $1,500.

incurred defending himself in the underlying criminal action.
See Sabir v. Jowett, 214 F. Supp. 2d 226, 245 (D. Conn. 2002)
(upholding a jury's compensatory damages award for false arrest
where, inter alia, the "plaintiff ... introduced evidence that
he had to hire, and pay for, an attorney as a result of the
defendants' actions.").

The Court also finds that that Gibson is entitled to
compensatory damages for the deprivation of liberty he suffered
as a result of the improper arrest in the amount of $15,000. In
arriving at this figure, the Court has considered the duration
of the deprivation of liberty, which is alleged to have been
only a few hours. The Court has also considered the lack of
evidence of any public reports of the incident, and the
accompanying embarrassment that would follow. See, e.g., Dancy
v. McGinley, 843 F.3d 93, 115 (2d Cir. 2016) (discussing
relevance of public humiliation to damages awards in false
arrest cases).

The Court further finds that plaintiff is entitled to
damages in the amount of $10,000 for emotional distress. The
Court notes that "expert witness evidence is not required to
sustain an award of emotional distress damages in §1983 cases."
Sabir, 214 F. Supp. 2d at 245. In arriving at this figure, the
Court has considered the evidence at trial that Gibson suffered
the after-effects of the incident for approximately one month,

and the lack of evidence that he sought any professional treatment or that the effects persisted after that one month period.

Thus, the Court finds that a total award of $38,500 in compensatory damages is appropriate.

**B.    Punitive Damages**

Punitive damages may be awarded "in an action under §1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). "[T]he purpose of punitive damage awards is to punish the defendant and to deter him and others from similar conduct in the future." Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992) (citing Smith, 461 U.S. at 54); see also BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996) ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition.").

There was no evidence presented in this case that would justify an award of punitive damages. Chivers' conduct did not appear to be "motivated by evil motive or intent," nor he exhibit "reckless or callous indifference" to Gibson's rights. Smith, 461 U.S. at 56. As discussed above, the Court determined that Chivers believed, albeit unreasonably, that Gibson had

committed the offense for which he was charged.  Accordingly, the Court declines to award punitive damages.

### C.  Attorney's Fees

Pursuant to 42 U.S.C. §1988, "a prevailing plaintiff [in an action brought under section 1983] is entitled to an award of attorneys' fees unless 'special circumstances would render such an award unjust.'" <u>Henry</u>, 803 F.2d at 769 (quoting <u>Newman v. Piggie Park Enterprises</u>, 390 U.S. 400, 402 (1968) (<u>per</u> <u>curiam</u>)).

> For a plaintiff to be considered a "prevailing party," and thus eligible for an award of fees, he need not have succeeded on the central issue in the case, and need not have obtained the primary relief sought.  It is sufficient that the plaintiff succeeded on any significant issue in the litigation, regardless of the magnitude of the relief obtained, if he received actual relief on the merits of his claim that materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

<u>LeBlanc-Sternberg v. Fletcher</u>, 143 F.3d 748, 757 (2d Cir. 1998) (internal quotation marks and citations omitted).

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983). Thus, "[t]he party seeking an award of fees should submit evidence supporting the hours worked and rates claimed." <u>Id.</u> at 433.

Plaintiff Gibson is a prevailing plaintiff for the purposes of 42 U.S.C. §1988, and is therefore entitled to collect the

reasonable attorney's fees and costs associated with the litigation of Gibson's claim of false arrest. Accordingly, counsel for Gibson shall submit an accounting of fees sought in connection with the litigation of plaintiff Gibson's false arrest claims, including the number of hours claimed; a statement of whether the hours were incurred by an attorney, a paralegal, or other employee; and the hourly rate sought.

## CONCLUSION

As set forth above, the Court finds that plaintiff Gibson has proven by the preponderance of the evidence that he was falsely arrested, in violation of his Fourth Amendment rights under 28 U.S.C. §1983. The Court further finds that plaintiff Gibson has failed to prove that he was maliciously prosecuted, in violation of his Fourth Amendment rights; and that plaintiff Goff has failed to prove that she was subjected to excessive force, in violation of her Fourth Amendment rights.

The Clerk shall enter judgment in favor of plaintiff Gibson for his claim of false arrest for the amount of $38,500, plus attorney's fees and costs. The Clerk shall enter judgment in favor of defendant Chivers on all other remaining claims.


This is not a Recommended Ruling. The parties consented to proceed before a United States Magistrate Judge on January 15,

2016 [Doc. #50], with any appeal to be made directly to the Court of Appeals. <u>See</u> Fed. R. Civ. P. 73(b)-(c).

     SO ORDERED at New Haven, Connecticut, this 17th day of May, 2017.

_____/s/_____
HON. SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE
